# United States District Court

### FOR THE
### NORTHERN DISTRICT OF CALIFORNIA

VENUE: SAN FRANCISCO

UNITED STATES OF AMERICA,

V.

RACO IVANOV JORDANOV,
also known as "Racho" Jordanov, and
ROSE LIN,
also known as Rose Sweihorn Tong,

CR 21-0227 VC

DEFENDANT(S).

| FILED |
| :---: |
| Jun 01 2021 |
| SUSAN Y. SOONG |
| CLERK, U.S. DISTRICT COURT |
| NORTHERN DISTRICT OF CALIFORNIA |
| SAN FRANCISCO |

## INDICTMENT

18 U.S.C. § 371 – Conspiracy to Commit Theft of Trade Secrets and Wire Fraud;
18 U.S.C. § 1832(a) – Theft of Trade Secrets;
18 U.S.C. § 1343 – Wire Fraud;
18 U.S.C. §§ 1956(a)(2)(A) and 2 – International Laundering of Monetary Instruments;
18 U.S.C. § 371 – Conspiracy to Obstruct Justice, Victim, or an Informant;
18 U.S.C. § 1001 – False Statements;
18 U.S.C. §§ 982, 1834, and 2323 – Criminal Forfeiture

A true bill.

/s/ Foreperson of the Grand Jury

Foreman

Filed in open court this ____1st____ day of

June 2021 ____.

Clerk

Bail, $ ___No bail___

1  STEPHANIE M. HINDS (CABN 154284)
   Acting United States Attorney

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10                    SAN FRANCISCO DIVISION

11  UNITED STATES OF AMERICA,                ) CASE NO.  CR 21-0227 VC
                                             )
12          Plaintiff,                       )
                                             )
13      v.                                   ) VIOLATIONS:
                                             ) 18 U.S.C. § 371 − Conspiracy to Commit Theft of
14  RACO IVANOV JORDANOV,                    ) Trade Secrets and Wire Fraud; 18 U.S.C. § 1832(a) −
        also known as "Racho" Jordanov, and  ) Theft of Trade Secrets; 18 U.S.C. § 1343 − Wire
15  ROSE LIN,                                ) Fraud; 18 U.S.C. §§ 1956(a)(2)(A) and 2 −
        also known as Rose Sweihorn Tong,    ) International Laundering of Monetary Instruments;
16                                           ) 18 U.S.C. § 371 − Conspiracy to Obstruct Justice,
            Defendants.                      ) Victim, or an Informant; 18 U.S.C. § 1001 − False
17                                           ) Statements; and 18 U.S.C. §§ 982, 1834, and 2323 −
                                             ) Criminal Forfeiture
18                                           )
                                             ) SAN FRANCISCO VENUE
19  _____ ) UNDER SEAL

20

21                          I N D I C T M E N T

22  The Grand Jury charges:

23                        Introductory Allegations

24  Relevant Companies

25          1.      Eden Biologics, Inc., and Chime Biologics (Wuhan) Co., Ltd., formerly known as JHL

26  Biotech, Inc. (collectively "JHL Biotech") was founded in 2012.  Between in or about 2012 and 2019,

27  JHL Biotech was headquartered in Zhubei, Taiwan, and maintained offices and other facilities in

28  Rancho Santa Fe, California, and Wuhan, China.  JHL Biotech operates as a biopharmaceutical

INDICTMENT

FILED

Jun 01 2021

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

1    company worldwide.  JHL Biotech provides cell line cloning, process development, and manufacturing

2    capabilities and services to emerging and established biopharmaceutical companies seeking to

3    collaboratively develop, manufacture, and commercialize new, high-quality, affordable biologics.  Until

4    2019, JHL Biotech was developing biosimilars of biopharmaceuticals made by Genentech, Inc.  These

5    biosimilars included Pulmozyme, Rituxan, Herceptin, and Avastin.  Beginning in or about September

6    2015, JHL Biotech securities were traded on the Taiwan Emerging Stock Board, also known as the

7    Taiwan stock exchange.  In or about December 2015, at its peak valuation, JHL Biotech had a market

8    capitalization of approximately $916 million.

9         2.      Between in or about 2012 and 2019, JHL Biotech conducted a substantial amount of its

10   business in the Northern District of California and other parts of the United States.  JHL Biotech email

11   regularly stated that JHL Biotech maintained a "U.S. Office" in Rancho Santa Fe, California, from

12   which the Chief Executive Officer of JHL Biotech often conducted business.  The Chief Operating

13   Officer of JHL Biotech regularly travelled to and worked from her home in the San Francisco area to

14   conduct the business of JHL Biotech.  Other employees of JHL Biotech regularly worked from the

15   Northern District of California using telephone, email, and video conferencing, travelling only

16   intermittently to its offices in Taiwan.  JHL Biotech obtained critical early financing from venture

17   capital firms based in the Northern District of California, conducting multiple meetings in the Northern

18   District of California to promote investment in JHL Biotech.  JHL Biotech's Chief Executive Officer

19   and Chief Operating Officer regularly attended the annual JP Morgan Healthcare conference in San

20   Francisco.  JHL Biotech and its senior officers sold JHL Biotech securities to investors in the Northern

21   District of California and other parts of the United States.  JHL Biotech used a major bank based in the

22   Northern District of California to, among other banking services, pay its salary, compensation, and other

23   benefits, to JHL Biotech employees in the United States.  JHL Biotech obtained approximately $1

24   million in funding from at least one Northern District of California start-up biotech company to provide

25   contract manufacturing of a drug developed in the United States.  JHL Biotech sought investment

26   banking services from several major banks in the United States when it evaluated whether to trade its

27   securities on the NASDAQ stock market in New York.  JHL Biotech used at least one major law firm in

28   the United States to represent it in corporate transactions.  One or more senior officers of JHL Biotech

INDICTMENT           2

regularly emailed with, telephoned with, or travelled to meet, current and former Genentech employees in the Northern District of California to recruit them to work at JHL Biotech or enlist them to pass information from Genentech to JHL Biotech.  And, as further alleged herein, JHL Biotech regularly used concealed email and other electronic communications with a current employee at Genentech working in the Northern District of California, to solve scientific problems, accelerate drug development timelines, and otherwise reduce expenses and enhance its ability to make a profit.

3.      Genentech, Inc. ("Genentech") is a biotechnology corporation, established in 1976, with a principal place of business in South San Francisco, California.  Genentech has been part of the Roche Group since March 2009.  Genentech has been discovering, developing, manufacturing, and commercializing pharmaceutical therapies for more than 40 years.  Genentech manufactured and commercialized biopharmaceuticals for a variety of medical conditions, including cancer, rheumatoid arthritis, heart attack, stroke, and others.

4.      Sanofi S.A. ("Sanofi") is a French multinational pharmaceutical company headquartered in Paris, France.  Sanofi engages in the research and development, manufacturing, and marketing of pharmaceutical drugs principally in the prescription drug market.  Sanofi covers major therapeutic areas including cardiovascular, central nervous system, diabetes, internal medicine, oncology, thrombosis, and vaccines.  As of 2013, Sanofi was the world's fifth largest pharmaceutical company by prescriptions sales.  Sanofi HangZhou Pharmaceuticals Co, Ltd. and Sanofi Aventis Singapore, Pte. Ltv. are wholly owned subsidiaries of Sanofi with operations in China and Singapore, respectively.

5.      EUSOL Biotech Co. Ltd. ("Eusol Biotech") is a biotechnology company based in Taiwan that was founded in 2005.  Eusol Biotech is a company that is developing new drugs to fulfill unmet medical needs.

6.      Mycenax Biotech, Inc. ("MYCENAX") is a biotechnology company based in Taiwan that was founded in 2011.  MYCENAX's English language website (www.mycenax.com.tw/en) states that it is a company with a biopharmaceutical development and manufacturing platform.  The company's website identifies six biosimilars under development:  Tocilizumab (Actemra), bevacizumab (Avastin), G-CSF (Neupogen), Omalizumab (Xolair), Adalimumab (Humira), and Trastuzumab (Herceptin).  Four of these biologics—Actemra, Avastin, Xolair, and Herceptin—are products

developed or co-developed by Genentech.

The Defendants

7.      RACO IVANOV JORDANOV also known as "Racho" Jordanov ("JORDANOV"), a citizen of the United States, has maintained a residence in Rancho Santa Fe, California, since in or about 1992.  From in or about 1981 to in or about 2011, JORDANOV worked at Genentech where, among other things, he developed processes for monoclonal antibody (mAB) production and outsourcing capabilities for drug substances, drug products, and medical devices.  In late 2011, JORDANOV co-founded JHL Biotech with the co-defendant.  From in or about 2012 to in or about 2019, JORDANOV was Chief Executive Officer ("CEO") and President of JHL Biotech.  JORDANOV received compensation, equity, and benefits from JHL Biotech that exceeded approximately $30.4 million.

8.      ROSE LIN also known as Rose Sweihorn Tong ("LIN"), a citizen of the United States, has maintained a residence in South San Francisco, California, since in or about 1999.  From in or about 1987 to in or about 2009, LIN worked at Genentech in various roles including Biochemical Project Manager.  From at least in or about December 2009 to in or about August 2012, LIN worked at Eusol Biotech in Taiwan as a Plant Manager.  In or about late 2011, LIN co-founded JHL Biotech with the co-defendant.  From in or about 2012 to in or about 2019, LIN was the Taiwan General Manager and Chief Operating Officer of JHL Biotech.  LIN received compensation, equity, and benefits from JHL Biotech that exceeded approximately $22 million.

9.      In or about January 2007, while both still worked at Genentech, JORDANOV and LIN began a long-term personal relationship.  In or around December 24, 2012, after they began discussions to start JHL Biotech, and to separate their professional and personal communications, JORDANOV created a new email account for his personal communications with LIN.

The Co-Conspirators

10.     Xanthe Lam, also known as Mei-Ling Sheung and "M.L.", was employed by Genentech from in or about 1986 until in or about 2017.  From in or about 2013 to in or about 2017, Xanthe Lam was a Principal Scientist at Genentech and worked in formulation development.  From in about 2013 to in or about 2015, and then again in or about 2017, Xanthe Lam also secretly worked for JHL Biotech in violation of her employment contract with Genentech.

11.    Allen Lam, also known as Allen Cho Lun Lam, worked at Genentech from in or about 1989 to in or about 1998 in the Quality Control department.  In or about 1998, Allen Lam resigned from Genentech after he began working for another biotechnology company during a sabbatical from Genentech.  From in or about 2010 to in or about 2015, Allen Lam worked at Eusol Biotech as a consultant.  From in or about 2013 to in or about 2015, and then again in or about 2017, Allen Lam worked at JHL Biotech as a consultant.

12.    At all times relevant to this Indictment, Xanthe Lam and Allen Lam were married and resided in South San Francisco, California.

13.    Other persons working at JHL Biotech known and unknown to the Grand Jury are co-conspirators.

Biologics and Biosimilars

14.    Biologics, also known as Biopharmaceuticals, are a class of large-molecule drugs that are created using genetically modified living cells.  Relevant to this Indictment, Genentech is the "innovator," that is, it has developed, manufactured, and marketed the following biologics, used in and intended to be used on-label in interstate and foreign commerce:

a.    Pulmozyme (dornase alfa), an enzyme for use in treating cystic fibrosis.

b.    Rituxan (rituximab), a monoclonal antibody for use in treating certain types of non-Hodgkin's lymphoma and chronic lymphocytic leukemia.

c.    Herceptin (trastuzumab), a monoclonal antibody for use in treating certain types of breast and gastric cancers.

d.    Avastin (bevacizumab), a monoclonal antibody for use in treating certain types of colorectal, lung, kidney, cervical, ovarian, liver, and brain cancers.

e.    Tecentriq (atezolizumab), a programmed death-ligand 1 ("PD-L1" or "PD-1") blocking antibody, for use in treating certain types of bladder, lung, breast, skin, and liver cancers.

15.    Biosimilars are biologics designed to have active properties like a previously approved drug.  They are roughly the equivalent to a "generic" form of a biologic.  The Biologics Price Competition and Innovation Act ("BPCIA"), 42 U.S.C. § 262, enacted in 2010, provides for abbreviated

regulatory approval for biosimilars by letting applicants rely on the extensive clinical testing previously conducted by the innovator company that developed the medicine the applicant wants to copy.

16.    As of the date of this filing, the United States Food and Drug Administration ("FDA") has approved biosimilars for Rituxan, Avastin, and Herceptin to be marketed in the United States.

Genentech Trade Secrets

17.    Genentech's biopharmaceutical technology contained trade secrets, as defined in Title 18, United States Code, Section 1839(3), that were included in, and intended to be included in, products sold worldwide. Genentech's biopharmaceutical technology included, but was not limited to, the following valuable, non-public information that Genentech developed through research and development:

a.    Stability Assays for Pulmozyme: Genentech developed "assays," or proprietary analytical methods, to test and validate the stability of Pulmozyme. These assays ensure that Pulmozyme stored in bulk (as drug substance) and in vials (as final drug product) is stable and will remain so over time.

b.    Methyl Green Assay for Quantitating the Activity of Pulmozyme: Genentech developed a proprietary procedure for quantitating the activity of Pulmozyme using a methyl green assay. Genentech's methyl green assay includes specifications for preparing the sample, sample preparation protocols, detailed instructions for running the assay and for analyzing the results, and acceptance criteria.

c.    Methyl Green Assay for Identifying Pulmozyme: Genentech developed a proprietary procedure for identifying Pulmozyme using a methyl green assay.

d.    ███████████ in Pulmozyme: Genentech developed detailed proprietary assays for determining ████████████████████████ of Pulmozyme. Genentech determined the acceptable range of ████████████████████ based on historical results from its proprietary assays.

e.    Use of Stedim Bags: Genentech invested significant time in developing and running proprietary test procedures to determine the suitability of single-use bio process bags, in particular "Stedim" bags, for storing Pulmozyme in bulk (as drug substance). Genentech's research, which it has maintained confidential and detailed in a report, reveals how to best test

for chemical, physical, and biological stability when Pulmozyme is stored in Stedim bags, including the chromatographic, spectroscopic, and pH analyses performed and the results of those test procedures over an extended period of time.

f.    Purity Assays for Rituxan:  Genentech developed proprietary assays to determine the purity of Rituxan, including step-by-step instructions for conducting those assays and the expected results for those assays.

g.    Quality Assays for Rituxan:  Genentech developed a set of proprietary assays and corresponding specifications to assure the quality of Rituxan.

h.    Peptide Mapping for Rituxan:  Genentech developed a proprietary assay to determine the "fingerprint" of the protein in Rituxan through peptide (short chains of amino acid molecules) mapping, including step-by-step instructions for conducting that assay and the expected results for that assay.

i.    Glycan Assays for Rituxan:  Genentech developed proprietary assays to determine the glycosylation (when a carbohydrate is attached to a functional group of another molecule) of Rituxan, including step-by-step instructions for conducting these assays and the expected results for those assays.

j.    Excerpts of Genentech's BLA Submission for Rituxan:  As required by the FDA, Genentech submitted a Biologics License Application ("BLA") for Rituxan to the FDA.  The FDA maintains the confidentiality of BLA filings.  The Rituxan BLA submission contained Genentech's proprietary information regarding the manufacture of Rituxan and included its drug substance and drug product specifications and analytical methods, as well as its in-process quality control methods.

k.    Stability Assays for Herceptin:  Genentech developed proprietary analytical methods to test and validate the stability of Herceptin.  These methods are critical to ensuring that the drug substance and final drug product are stable and will remain so over time.

l.    Raw Material Management:  Genentech developed proprietary policies and procedures relating to the management of raw materials, including quality systems for managing the receipt, identification, storage, handling, control, movement, sampling, dispensing,

distribution, and release of raw materials.  The proper management of raw materials is critical to the manufacturing process and requires extensive and time-consuming research and testing to assure the quality of materials used in manufacturing.

m.    Avastin v1.2 Recovery Process Technical Reference:  Genentech developed and maintained a confidential document entitled Avastin v1.2 Recovery Process Technical Reference that contains a secret, highly valuable, and highly specific process for manufacturing Avastin.

n.    Herceptin v1.1 Cell Culture Technical Reference Commercial Production: Genentech developed and maintained a confidential document entitled Herceptin v1.1 Cell Culture Technical Reference Commercial Production that contains a highly secret and highly valuable process for generating the cell culture needed to produce Herceptin.

o.    Technology Transfer Know-How:  Genentech developed proprietary and carefully designed master service agreements, material transfer agreements, technology transfer policies, process implementation plans, product outsourcing requirements, handbooks, and other so-called "tech transfer" or "technology transfer" documents which set forth the technical and business procedures by which Genentech shares and exchanges confidential and trade secret information, subject to non-disclosure agreements, to establish manufacturing capabilities in new locations and with new corporate partners.

18.    Genentech assigned numerical or alphanumerical codes to each of its confidential testing procedures, reports, and assays, including those identified above.  Those codes were internal to Genentech and not matters of public knowledge.  Genentech kept its valuable, non-public information in secured locations, including in secured databases limited to individuals with usernames and passwords. To the extent that Genentech shared its valuable, non-public information outside the company, it did so pursuant to non-disclosure provisions.

Genentech's Civil Lawsuit

19.    On or about October 29, 2018, Genentech sued JHL Biotech, in the Northern District of California, in a civil action captioned *Genentech v. JHL Biotech et al.*, Case No. 18-cv-06582 WHA (the "lawsuit").  The lawsuit included allegations that JHL Biotech and its co-founders, employees, and consultants had misappropriated Genentech's trade secrets.  Following the public allegations of

1   misappropriation of trade secrets, the value of JHL Biotech crashed, causing hundreds of millions of

2   dollars in losses to investors, strategic partners, and others in the United States and elsewhere.

3          20.     In or about August 2019, JHL Biotech settled the lawsuit brought by Genentech and

4   agreed, among other things, to destroy the cell lines and otherwise cease all development of four

5   biosimilars of Genentech products on which JHL Biotech had been working for approximately six (6)

6   years.  This included an agreement to stop work on biosimilars of Pulmozyme, Rituxan, Herceptin, and

7   Avastin.  On information and belief, Genentech spent at least $120 million developing the confidential

8   procedures, assays, and other materials and know-how during the technical development of Pulmozyme,

9   Rituxan, Avastin, and Herceptin.  This estimate of technical development costs does not include costs

10  relating to early research and development of the medicines, development pertaining to additional

11  versions of these medicines, or costs associated with running clinical trials or making regulatory

12  submissions pertaining to these medicines.

13  <u>The Theft of Confidential, Proprietary, and Trade Secret Information</u>

14         21.     Beginning as early as 2008, while both JORDANOV and LIN were still at Genentech,

15  continuing to in or about 2019, defendants JORDANOV and LIN, together with others, including

16  Xanthe Lam and Allen Lam, engaged in a fraudulent scheme to steal, and otherwise obtain, confidential,

17  proprietary, and trade secret information, from Genentech, and other biotech companies, and use it to

18  accelerate the timeline for, and reduce the costs of, JHL Biotech's development and production of

19  biosimilars or generic versions of Genentech biologics.

20         22.     In so doing, JORDANOV and LIN converted, and intended to convert, confidential,

21  proprietary, and trade secret information, relating to a product or service used, and intended to be used,

22  in interstate and foreign commerce, to the economic benefit of JHL Biotech and themselves, and not the

23  owner thereof, and, intending and knowing that the offense will injure the owner thereof, knowingly (a)

24  stole, appropriated without authorization, took, carried away, concealed, obtained by fraud, artifice, and

25  deception, such confidential, proprietary, and trade secret information; (b) without authorization, copied,

26  duplicated, sketched, drew, photographed, downloaded, uploaded, altered, destroyed, photocopied,

27  replicated, transmitted, delivered, sent, mailed, communicated, and conveyed, such confidential,

28  proprietary, and trade secret information; (c) received, bought, and possessed, such confidential,

proprietary, and trade secret information, knowing that it had been stolen, misappropriated, obtained, and converted without authorization; and (d) attempted to do the same.

23.    JORDANOV and LIN, along with others at JHL Biotech, obtained thousands of stolen confidential and proprietary documents from Genentech, some of which contained trade secret information.  JORDANOV brought some of the stolen confidential, proprietary, and trade secret information to JHL Biotech himself.  Some or all the stolen information was brought to JHL Biotech in violation of relevant non-disclosure agreements and employment contracts.  JORDANOV and LIN hired many former Genentech employees to work at JHL Biotech, several of whom surreptitiously brought stolen confidential and proprietary documents, including trade secrets, with them from Genentech to JHL Biotech.

24.    JORDANOV and LIN, and others at JHL Biotech, used only some of the thousands of stolen documents.  But all of the stolen documents were available to JORDANOV and LIN, and others at JHL Biotech, when needed, to cheat, cut corners, solve problems, provide examples, avoid further experimentation, eliminate costs, lend scientific assurance, and otherwise help JHL Biotech start-up, develop, and operate, its business secretly using the intellectual property and scientific know-how taken from the hard work of individuals at other biotech companies.

25.    When the above-described library of stolen confidential information was not enough, JORDANOV and LIN both solicited and recruited persons working at Genentech to pass other forms of confidential and proprietary information from Genentech to JHL Biotech.

26.    As early as in or about 2009, while she worked at Eusol Biotech, LIN groomed and recruited Xanthe Lam and Allen Lam to work as a corporate spy team who could purloin and take confidential information from within Genentech, give it to LIN and those with whom she worked, first at Eusol Biotech and later JHL Biotech, and thus help LIN and those companies cut corners, reduce costs, solve problems, save time, and otherwise accelerate product development timelines, secretly using Genentech's high-quality, confidential, intellectual property.  In this way, LIN enabled JHL Biotech to have access to confidential, proprietary, and trade secret information, at Genentech in real time.

27.    First at Eusol Biotech starting in or about December 2009, and later at JHL Biotech in or about 2013, LIN hired Allen Lam as a consultant, in part, to secretly have access to the confidential and

1   proprietary intellectual property and know-how of his wife, Xanthe Lam, an experienced and

2   accomplished scientist at Genentech.

3       28.     In or about 2009, during the economic downturn following the 2008 financial crisis,

4   Allen Lam was out of work.  Allen Lam and Xanthe Lam were also in mourning after the death of their

5   son in late 2008.  In the wake of these tragedies, LIN helped Allen Lam negotiate a consulting

6   agreement with Eusol Biotech, finding him a company apartment while he worked from Taiwan.

7       29.     In or around December 2009, when LIN first hired Allen Lam and Xanthe Lam to

8   provide consulting services, and at all relevant times thereafter, Xanthe Lam was a Genentech employee

9   whose employment agreement forbade her from concurrently providing consulting services to a

10  potential competitor without the agreement of Genentech.

11      30.     On December 25, 2009, LIN told Allen Lam she was negotiating for him to be paid

12  "$10,000-$12,000" and suggested that Allen Lam "let them counter because Xanthe helps a lot.  So I

13  think it is a fair price for your contract."  In February 2010, when he arrived at Eusol Biotech to start his

14  consulting work, Allen Lam was given a set of project deliverables.  However, many were outside of the

15  scope of his knowledge and expertise.  They were, however, within the scope of expertise of his wife,

16  Xanthe Lam.  Not long after Allen Lam began consulting for Eusol Biotech, LIN began soliciting

17  assistance from Xanthe Lam to help Eusol Biotech with its formulation development.  LIN soon

18  solicited Xanthe Lam to spend a sabbatical from Genentech assisting Eusol Biotech and its junior

19  formulation scientist, J.H.

20      31.     LIN then introduced Xanthe Lam and Allen Lam to another Taiwanese biotech company,

21  Mycenax, which engaged both to provide consulting services using the same ruse employed by EUOSL:

22  a consulting agreement with Allen Lam alone, but work performed and invoiced by both.  Allen Lam

23  described this is "the exact same kind of setup and consensus with EUSOL".  However, seemingly to

24  protect the confidential of Mycenax's information, Xanthe Lam did sign a confidentiality agreement

25  with EUSOL.  Mycenax was a direct competitor to Genentech.

26      32.     While Xanthe Lam continued to work at Genentech, first LIN alone, and then

27  JORDANOV and LIN, used Allen Lam to secretly obtain Xanthe Lam's scientific expertise and

28  confidential Genentech information that she passed to Allen Lam.  This information helped Eusol

INDICTMENT                          11

Biotech and then JHL Biotech with the biosimilar formulation science necessary to maintain large quantities of the biosimilars in a pure, stable, and safe manner.

33.    Beginning in or about late 2013 and continuing to in or about 2014, to help make JHL Biotech operational quickly, JORDANOV and LIN used many of the confidential and proprietary documents stolen from Genentech to create a set of JHL Biotech standard operating procedures ("SOPs").  JHL Biotech hurried to draft these SOPs because they were necessary to apply for the initial Good Manufacturing Practices or "GMP" certification of its manufacturing facility by the Taiwan Food and Drug Administration or "Taiwan FDA."

34.    To do this, JORDANOV and LIN supervised and managed a so-called "conversion" project whereby confidential Genentech SOPs were converted into alleged JHL Biotech SOPs.  JHL Biotech employees drafted approximately ninety (90) different SOPs using Genentech documents, many of which were confidential and proprietary.  JHL Biotech employees maintained a spreadsheet in which they identified Genentech SOPs that JHL Biotech possessed and needed to be converted and tracked their progress.  JHL Biotech maintained a "TFDA GMP Certification Prep: Master Document List", which blatantly identified the "Genentech converted files" being converted for the use of JHL Biotech:

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 1 | Red- actions due immediately within 30 days | | | | |
| 2 | Orange - actions due within 90 days | | | | |
| 3 | Tan - actions due > 120 days | | | | |
| 4 | Doc Code | JHL Document Title | Category | | genetech converted files (renamed) |

35.    In some instances, JHL Biotech employees, acting at the direction of JORDANOV and LIN and others at JHL Biotech, engaged in the wholesale cutting and pasting of logos from the confidential documents by simply cutting out Genentech logos and pasting in JHL Biotech logos to make the Genentech SOPs appear, falsely, to be JHL Biotech SOPs.

36.    JHL Biotech lacked personnel with the ability to devise and write all the necessary SOPs on their own.  The widespread use of Genentech SOPs saved JHL Biotech thousands of dollars and allowed JHL Biotech to gain certification from the Taiwan FDA that it might not otherwise have lawfully achieved in the same amount of time.

The Scheme to Defraud

37.     To profit from the trove of stolen confidential, proprietary, and trade secret information, JORDANOV and LIN carried out a scheme to defraud investors and strategic partners of JHL Biotech. To induce investment, and obtain money for JHL Biotech and themselves, JORDANOV and LIN, and others at JHL Biotech, defrauded investors and strategic partners like Sanofi by concealing the extent to which JHL Biotech used stolen intellectual property to start, accelerate, and conduct its business.

38.     JORDANOV and LIN, and others at JHL Biotech, made it appear, falsely, that JHL Biotech had developed its own, or had lawfully obtained, the intellectual property on which the biotech company was built when, in fact, JHL Biotech used stolen intellectual property, including stolen confidential, proprietary, and trade secret information, to develop certain of the company's biosimilars, obtain regulatory approval for its clinical trials, and build out its manufacturing capability.

39.     Having devised and intending to devise this scheme and artifice to defraud, and to obtain money and property from investors like Sanofi and others by means of false and fraudulent pretenses, representations, and promises, JORDANOV and LIN transmitted and caused to be transmitted, by means of wire and interstate and foreign commerce, writings and other signs, signals, pictures, and sounds, for the purpose of executing the scheme and artifice to defraud as further alleged herein.

40.     In or about 2012 through in or about 2016, JORDANOV and LIN obtained initial financing for JHL Biotech by defrauding early venture capital investors.  When they raised money from investors, the defendants did so by falsely holding JHL Biotech out as a company that was allegedly compliant with intellectual property laws and fraudulently omitting material facts about the risks to JHL Biotech caused by its misappropriation and theft of intellectual property belonging to other biotech companies.

41.     In or about late 2016, JORDANOV and LIN defrauded Sanofi out of millions of dollars. Beginning in or about early 2015 and continuing through in or about late 2018, JHL Biotech and Sanofi negotiated, agreed to, and worked together on, a major strategic relationship whereby Sanofi would invest hundreds of millions of U.S. dollars in JHL Biotech.

42.     In or about late 2016, JHL Biotech entered a strategic partnership with Sanofi to manufacture and distribute biosimilars in China.  As part of the agreement, Sanofi agreed that it would

1    invest $80 million in JHL Biotech in exchange for securities in the company pursuant to a Subscription

2    Agreement.  In addition, Sanofi and JHL Biotech entered into a Biologics Products Options Agreement

3    ("BPOA"), pursuant to which Sanofi obtained the rights to market and sell JHL Biotech biologics in

4    China in exchange for certain payments.  Initially, Sanofi and JHL Biotech planned to develop,

5    manufacture, and sell a biosimilar of Genentech's biologic Rituxan.

6        43.    In or about December 2016, pursuant to the BPOA, Sanofi made an initial upfront

7    payment to JHL Biotech of approximately $20 million and an additional $1 million for the exercise of

8    an option.  When added to the $80 million investment in securities pursuant to the Subscription

9    Agreement, Sanofi paid a total of approximately $101 million in cash to JHL Biotech in or about

10   December 2016 and January 2017.  The total value of JHL Biotech's partnership with Sanofi, including

11   the $80 million investment in securities, and all potential payments under the BPOA, provided all

12   milestones were reached, totaled approximately $337 million.

13       44.    JHL Biotech used a major law firm in the United States to allow facilitate due diligence

14   by Sanofi and its counsel regarding this multi-million-dollar corporate transaction.  Among many other

15   risks and considerations evaluated during the due diligence, Sanofi and its counsel asked questions and

16   required representations and warranties about the freedom to operate and the existence of intellectual

17   property risk at JHL Biotech.  Sanofi and its counsel also asked questions and required representations

18   and warranties about JHL Biotech's use of consultants like Xanthe Lam.  JORDANOV and LIN

19   personally participated in key aspects of the due diligence inquiry by Sanofi and its lawyers.

20       45.    JORDANOV signed representations and warranties on behalf of JHL Biotech that,

21   among other things, falsely stated that JHL Biotech's knowledge, research, development, use, and

22   manufacture, of certain biosimilars had been conducted without infringing or misappropriating

23   intellectual property from any third party.  JORDANOV also made false and misleading statements

24   about, among other things, consultants used by JHL Biotech and otherwise concealed the secret work of

25   Xanthe Lam for JHL Biotech.  LIN aided JORDANOV in making these false and misleading statements.

26       46.    In or about December 2016, acting in reliance on the truthfulness of these and other

27   representations and warranties, Sanofi agreed to the strategic partnership with JHL Biotech and made

28   initial payments to JHL Biotech under the BPOA and Subscription Agreement totalling approximately

INDICTMENT                          14

1   $101 million in cash.  Approximately $80 million of this multi-million-dollar payment by Sanofi to JHL

2   Biotech was transferred by bank wire transfer through the United States.

3          47.    In or about late 2019, following the settlement of the misappropriation allegations

4   brought by Genentech in the lawsuit, JHL Biotech destroyed the cell lines for, and ceased all work on,

5   the four biosimilars JHL Biotech had endeavored to develop based on the Genentech biologics Rituxan,

6   Pulmozyme, Avastin, and Herceptin.  In so doing, JHL Biotech abandoned approximately six (6) years

7   of the work by the biotech company.  By destroying its ability to manufacture and distribute biosimilars

8   for Sanofi, JHL Biotech, acting through its officers JORDANOV and LIN, caused actual losses to

9   Sanofi of approximately $101 million.

10         48.    The actions of JORDANOV and LIN, as officers of JHL Biotech, also defrauded and

11  caused financial harm to the investors in JHL Biotech securities.  In the aftermath of Genentech's

12  lawsuit, the value of JHL Biotech, once as high as approximately $916 million, crashed.  In or about

13  2019, following the lawsuit, the corporate value of JHL Biotech was so compromised and uncertain that

14  the company had difficulty establishing any reliable corporate valuation.  For these reasons, investors in

15  JHL Biotech, some of whom are in the United States, have sustained millions of dollars in losses from

16  the crash in value of the securities of JHL Biotech securities.

17  COUNT ONE: (18 U.S.C. § 371 – Conspiracy to Commit Trade Secret Theft and Wire Fraud)

18         49.    The factual allegations contained in Paragraphs 1 through 48 are realleged and

19  incorporated as if fully set forth here.

20         50.    From in or about 2010, and continuing until in or about 2019, in the Northern District of

21  California and elsewhere, the defendants,

22                          RACO IVANOV JORDANOV and
                            ROSE LIN,
23

24  did unlawfully, voluntarily, intentionally and knowingly conspire, combine, confederate, and agree with

25  one another, and with other persons both known and unknown to the Grand Jury, to commit offenses

26  against the United States, to wit, theft of trade secrets in violation of 18 U.S.C. § 1832(a) and wire fraud

27  in violation of 18 U.S.C. § 1343, and one or more such persons did an act to effect the object of the

28  conspiracy, namely, to obtain, possess, and use, stolen confidential, proprietary, and trade secret

information, to start-up, accelerate, and operate, JHL Biotech, and to obtain money for the biotech company and themselves, by making false and misleading statements, and by omitting and concealing material facts, to further their scheme and artifice to defraud.

The Manner and Means of the Conspiracy

51.     The defendants, JORDANOV and LIN, used the following manner and means, among others, to conspire to steal confidential, proprietary, and trade secret information, and to use interstate and foreign wires to carry out their scheme and artifice to defraud investors and strategic partners like Sanofi, and to obtain money and property for JHL Biotech and themselves.

52.     JORDANOV and LIN endeavored to conceal Xanthe Lam's work at JHL Biotech to persons outside the company.  Among other things, LIN directed employees to email with Xanthe Lam using the email address for Allen Lam, to which Xanthe Lam had access.  LIN further directed employees to address Xanthe Lam as "Allen" in email and avoid calling her "Xanthe" or using her nickname, "ML."  To further conceal Xanthe Lam's work at JHL Biotech, LIN falsified business records at JHL Biotech to make them falsely show payments only to Allen Lam, when, in fact, part of the compensation and benefits to Allen Lam were to compensate Xanthe Lam for her work at JHL Biotech. JORDANOV and LIN also concealed Xanthe Lam's work at JHL Biotech in their communications with outside investors like Sanofi.

53.     JORDANOV used confidential, proprietary, trade secret information stolen from Genentech relating to the transfer of technology from one facility to another facility to aid JHL Biotech in the development, construction, and operation of new facilities for JHL Biotech including its manufacturing facility in Wuhan, China.  JORDANOV instructed JHL Biotech employees to remove references to Genentech in the stolen documents and substitute "JHL Biotech" to make it appear, falsely, to be a JHL Biotech document.

54.     Other JHL Biotech employees aided in concealing the use at JHL Biotech of confidential, proprietary, trade secret information stolen from Genentech by, among other means, endeavoring to manipulate the metadata of certain electronically stored documents.

55.     JORDANOV and LIN met and communicated with investors and strategic partners like Sanofi, and their counsel, and made false and misleading statements, and omitted and concealed material

1  facts, about the possible misappropriation of intellectual property by JHL Biotech, to obtain money from

2  the investors for JHL Biotech and themselves.

3          56.     JORDANOV and LIN also concealed from investors and strategic partners the risks

4  associated with the fact that Xanthe Lam, a current Genentech employee, was secretly working for JHL

5  Biotech in violation of, among other things, the employment contract and non-disclosure agreement

6  Xanthe Lam had with Genentech.

7                                              Overt Acts

8          57.     In furtherance of the conspiracy, and to affect the objects thereof, the following overt

9  acts, among others, were committed in the Northern District of California, and elsewhere:

10                 a.      In or around July 7, 2011, JORDANOV prepared a protocol as part of his

11         consulting services for another biotechnology company that he emailed to the company, with a

12         blind copy to LIN.  LIN responded to JORDANOV, "Please save all the documents you prepared

13         for [COMPANY].  Some days, you may be able to use the same documents just change

14         company's name to Eusol or others.  Good job in changing every thing to [COMPANY]."

15         JORDANOV responded, "I will."

16                 b.      Beginning in at least October 2011, JORDANOV, LIN, and others began

17         discussing the idea of creating a biotechnology company based in Taiwan.  In or around October

18         2011, JORDANOV suggested that the company focus on biosimilars.  In evaluating a list of

19         potential products, JORDANOV focused JHL Biotech on developing biosimilars of Genentech

20         products.  JORDANOV wrote on October 11, 2011, "I know how to make Herceptin, Avastin,

21         Rituxan."

22                 c.      On or about October 25, 2011, when asked by a potential business partner about

23         whether their future company could effectively execute on a plan to develop biosimilars,

24         JORDANOV emphasized his experience with Genentech's biological products in an email,

25         stating "I am the one in the group with the technical know how to make biosimilars anywhere.

26         So my answer is YES this can work if we have the commitment of the Chinese Government to

27         purchase the products of the company."

28

d.      In or around January 23, 2012, JORDANOV emailed LIN and S.H. a copy of a Genentech technology transfer protocol marked "Confidential" that detailed the process to transfer manufacturing of Rituxan and Avastin to an alternative site.  JORDANOV circulated the document, suggesting that it be used to help with the business of JHL Biotech.

e.      On or about July 11, 2012, LIN emailed R.C., a Genentech employee using his Genentech email address, asking for R.C.'s personal email address because "I have some questions going to ask your wife".  R.C. provided the email address, and LIN then sent an email to the personal address stating that "the reason I wanted your personal email address is to ask your wife some QC raw material testing question."  LIN then wrote, "I do have a question for you, R.C.," and then asked a question that, on information or belief, related to R.C.'s work at Genentech.  LIN later wrote "Thank you for checking it out for me.  Because the guidelines are not a clear cut.  Thank you for checking it with your wife for me."  R.C. responded "Yes I understand that we shouldn't use Genentech email for such questions."

f.      On or about November 14, 2013, JORDANOV emailed J.H., a former colleague from Genentech at his Genentech and personal email addresses, stating "I need a template for a Master Service Agreement between CMO (JHL) and a customer (Company X) for contract manufacturing of a mAb.  Can you help me out?"  On or about November 14, 2013, J.H. responded from a personal email address attaching a Genentech Master Service Agreement marked as confidential.  JORDANOV then forwarded this agreement to W.S., a JHL Biotech employee, copying LIN.

g.      Starting in or around December 20, 2013, JORDANOV asked Allen Lam and Xanthe Lam to prepare a Certificate of Analysis ("CoA") for JHL Biotech's biosimilar of Pulmozyme, asking questions about how the "innovator" tested potency and activity.  On information and belief, "innovator" is a reference to Genentech.  Allen Lam responded by identifying the activity method used by Genentech and identifying an issue with using that method in Taiwan based on the requirement to use a particular solvent.  On December 21, 2013, JORDANOV sent an email to C.L., copying others within JHL Biotech, along with Allen Lam and Xanthe Lam and stating "please check with Allen and make sure that we use the same assay

as Genentech. Racho." C.L. responded to a subset of those copied on the email, excluding JORDANOV, to ask: "Do we really need to use the same assay with Genentech?" For JORDANOV, the answer appeared to be yes because, on or about January 7, 2014, Allen Lam sent an email to JORDANOV, copying LIN and others, attaching the Pulmozyme "activity assay used by the innovator". Allen Lam wrote: "At least the assay is familiar to the FDA/EMEA, and acceptable to them." This assay was largely copied from the Genentech activity assay for Pulmozyme and included information that was confidential, proprietary, and a trade secret of Genentech.

h.    In or around January 12, 2014, a JHL Biotech employee sent a copy of the JHL Biotech Taiwan Organization Chart to another employee, copying LIN on the email. The Organization Chart identified "Xanth Lam" as the head of formulation.

i.    In or about May 2014, JHL Biotech shared with a potential partner a set of slides summarizing its Pulmozyme biosimilar program. These slides include confidential, proprietary, and trade secret information from Genentech. When drafts of these slides were under review within JHL Biotech, and at a meeting attended by JORDANOV, another JHL Biotech executive identified what the executive believed to be Genentech confidential information in the slides. On information and belief, JORDANOV stated that this information was correct because it had come from "Allen." The JHL Biotech executive stated that s/he "did not want to end up in an orange jumpsuit" and did not believe that this information was publicly available. JORDANOV instructed JHL Biotech employees to try to find publicly available references to explain the usage of specific assays identified in the slides. In or around this time, JORDANOV also contacted Xanthe Lam to ask for information about Pulmozyme product specifications. JHL Biotech employees could not find public references supporting all of the information in the slides. However, JORDANOV instructed JHL Biotech employees to use the slides, which still contained confidential Genentech information, in the final slides presented to the potential partner.

j.    On or about May 12, 2014, JORDANOV circulated to others within JHL Biotech copying LIN, several CMO contract samples. Included in the documents that he circulated was a

Genentech document, marked as confidential, that detailed the process by which Genentech had transferred its technology to manufacture Rituxan in bulk to a site operated by Lonza.

k.    On or about May 14, 2014, JHL Biotech employee D.L. provided a thumb drive of documents to JORDANOV that, on information and belief, contained documents that D.L. had obtained from Genentech.  On May 14, 2014, D.L. emailed JORDANOV, copying LIN, stating:

> I forgot to include 3 of the files on the thumb drive I gave to you today. Here are 3 more of the files from my QC collaborations and tech transfer days …
>
> Please do not forward these files.  Please let me know if you want to use any of the files I gave you in the thumb drive or attached.  I can help edit them to make them JHL processes.
>
> I also have Quality agreement and other tech transfer docs for our use, just need to find the right ones.

D.L., who had previously worked at Genentech, attached to her email several documents belonging to Genentech that were marked as being confidential.

l.    On or about May 14, 2014, JORDANOV emailed D.L. with the subject "Tech transfer" and attached to his email a Technology Transfer Agreement and Process Implementation Plan between Genentech and Lonza to transfer manufacturing of Rituxan to a Lonza facility.

m.    On or about May 14, 2014, JORDANOV emailed D.L. with the subject "Tech transfer doc," asking "could you edit this agreement to make JHL.  I will edit the content." Attached to this email was the same Technology Transfer Agreement and Process Implementation Plan between Genentech and Lonza to transfer manufacturing of Rituxan to a Lonza facility.  D.L. responded "sure."  On or about May 21, 2014, another JHL Biotech employee circulated a redlined copy of this agreement to JORDANOV and others within JHL Biotech showing how this agreement had been modified to remove all references to Genentech and Lonza and to replace them with references to JHL Biotech and its proposed partner.

n.    On or about May 15, 2014, JORDANOV emailed D.L., stating "please turn yhis [sic] into Word doc and return to me.  Thanks!"  Attached to the email were PDFs of two

documents, one entitled "Avastin v1.2 Recovery Process Technical Reference" and another entitled "Herceptin v1.1 Cell Culture Technical Reference Commercial Production." Both contained secret, valuable information belonging to Genentech, clearly identified Genentech as the author, and were marked as being confidential. D.L. responded, attaching Word documents on May 15, 2014. On or about the same day, JORDANOV responded: "Can you transfer it to a new word document and remove all reference to Genentech including peoples names. Thanks! RJ". At least one of these documents became a template that, in or about December 2014, JHL Biotech sought to use in a partnership with another biotechnology company.

> o.    On or about November 28, 2014, LIN wrote to Allen Lam, copying JORDANOV, to inform him that JHL would be ending his consulting agreement, but offering to "keep the $1,000 monthly fees for the formulation section and adjust it to be $1,000." LIN had ensured that JHL Biotech paid $1,000 monthly to Allen Lam beyond what was specified in his JHL Biotech consultancy agreement to compensate Xanthe Lam for her work on behalf of JHL Biotech.

> p.    On or about December 2, 2014, LIN forwarded an email to D.L. that LIN originally had received from the personal email address of a Genentech employee in 2009, and which attached a Genentech Quality Control Method Validation document, which was marked as confidential. LIN forwarded the same document to two other JHL Biotech employees, J.H. and W.T.H. that same day.

> q.    On or about December 8, 2014, Allen Lam sent an email to LIN from his JHL Biotech email account responding to her suggestion that his contract be terminated, but offering to continue Xanthe Lam's formulation work. Allen Lam wrote, "our formulation development service to JHL cannot be continued as of 1/1/2015" for several reasons, including:

>> 1. The communication for the formulation project is through Allen's JHL email as the main connection. I expect that e-mail account to be inactivated after my contract expired. This is a common security policy of a company. Without that connection, ML might get into trouble using other mean of communication. Therefore, it is necessary to have a no "bridging" from JHL without the connection from me.

>> 2. ML will be very busy for this upcoming year. . . .

1
2
3

> 3. Currently she has a 1:1 as well as formulation teleconference meetings every week and needs to correspond to 3 people ([J.H., W.C., and J.C.]) dealing with topics from formulation to analytical and stability for various JHL projects.  It is too much of a workload for her after her day job.  Also, working in a remote fashion without being on-site is so inefficient. . . .

4    Xanthe Lam, who also goes by the name Mei-Ling Sheung, used her initials, ML, as another

5    form of subterfuge to hide her work at JHL.  LIN forwarded this email to JORDANOV, writing

6    "FYI".

7              r.       Given the threat of losing the chance to continue working with Xanthe Lam, LIN

8    negotiated a renewed contract to ensure that Allen Lam and Xanthe Lam continued their

9    consulting services for JHL Biotech in 2015.

10             s.       In or about March 18, 2015, Xanthe Lam emailed LIN to propose a video call to

11   discuss an issue about JHL Biotech's formulation of its Rituxan biosimilar.  As they had done

12   throughout their work at JHL Biotech, Xanthe Lam used Allen Lam's JHL Biotech email

13   account to hide broader knowledge of the fact that Xanthe Lam was providing secret consulting

14   services to JHL Biotech.  LIN was aware of this deception.  In this email, Xanthe signed her own

15   name in writing to LIN. In or around this time, Xanthe Lam spoke with JORDANOV about

16   whether or not to follow Genentech's Rituxan formulation or whether to use a formulation that

17   Xanthe Lam had developed and studied at JHL Biotech that could have infringed on Genentech's

18   formulation patents.  JHL Biotech faced a decision of whether to use stolen Genentech trade

19   secrets or potentially infringe on Genentech's patent.  Soon thereafter, JHL Biotech decided to

20   use Genentech's Rituxan formulation.

21             t.       In or around December 2015, Sanofi began a year-long due-diligence effort as

22   part of a potential partnership with JHL Biotech to develop and to market biosimilars in China.

23             u.       On or about January 6 and January 9, 2016, Sanofi hosted calls with JHL Biotech,

24   which included individuals participating from the United States, Europe, and China to begin the

25   due diligence process.

26             v.       On or about January 29, 2016, knowing that JHL Biotech was in the process of

27   developing four biosimilars all of Genentech products, a Sanofi executives specifically asked

28   JORDANOV whether it would be an issue that so many of JHL Biotech's executives previously

worked for Genentech.  JORDANOV responded that he did not see any issue.

w.    At no time did JHL Biotech ever disclose to Sanofi that Xanthe Lam had provided consulting services to JHL Biotech.

x.    On or about August 14, 2016, JORDANOV emailed JHL Biotech employee G.M. one document with the subject line "TT plan."  The email simply said:  "Here you go."  Attached was one Genentech document entitled "Technology Transfer Policy".

y.    On or about August 17, 2016, JORDANOV emailed two confidential Genentech documents pertaining to technology transfers to JHL Biotech employees S.H. and E.W.

z.    In or about late November 2016, representatives from JHL Biotech and Sanofi met to finalize the Biologics Portfolio Option Agreement ("BPOA") and Subscription Agreement that were the key agreements pursuant to which Sanofi committed to invest $101 million in JHL Biotech and agreed to the possibility of paying an additional $236 in milestone and royalty payments.  Over several days of meetings, LIN and JORDANOV met with representatives from Sanofi to go through the BPOA line-by-line.  LIN and JORDANOV actively reviewed the agreement with Sanofi representatives.

aa.    On or about December 2, 2016, Sanofi and JHL Biotech, with JORDANOV acting as the representative of JHL Biotech, signed the final BPOA and Subscription Agreement in Shanghai, China.

bb.    On or about December 5, 2016, counsel for Sanofi sent by a foreign and interstate wire an email from Shanghai, China, to the United States and the Northern District of California, attaching final versions of the signed BPOA and other key documents with Sanofi

cc.    On or about December 9, 2016, counsel for Sanofi sent by foreign and interstate wire an email from Shanghai, China, to the United States and the Northern District of California circulating final versions of the signed BPOA and other key documents that included the "chopped signature page" etc.

dd.    On or about December 16, 2016, by foreign and interstate bank wire from Singapore to the United States and the Southern District of New York, approximately $80 million USD was paid from Citibank Singapore for Sanofi-Aventis Singapore PTE. LTD. to Ta

Chong Bank LTD in Taiwan for the benefit of JHL Biotech, Inc., in the Cayman Islands, using

Citibank N.A. in New York, New York as the correspondent bank.

ee.     On or about May 20, 2017, LIN sought to bring Allen Lam and Xanthe Lam back

to JHL Biotech as consultants under the same terms of their prior consulting arrangement.  LIN

emailed Allen Lam and Xanthe Lam with a list of goals and timelines for additional work.  On or

about May 21, 2017, LIN forwarded this email thread with Allen and Xanthe Lam to

JORDANOV and others within JHL Biotech, stating:

> I am meeting Allen this coming Thursday to pass more guidance to Allen
> and his wife.
>
> Let's use the same consulting contract that we prepared in 2014.

ff.     On or about December 26, 2018, JORDANOV sent an email to individuals at

Sanofi requesting that Sanofi make a further milestone payment.  JORDANOV wrote, "we are

going to invoice for the Milestone and would appreciate your quick payment."  According to the

BPOA, this milestone was valued at $5 million.

gg.     On or about December 30, 2018, a representative from Sanofi responded thanking

JORDANOV for the information and asking for "an update about the ongoing suit with

Genentech," stating:  "As you can imagine, the allegations are concerning to us."

All in violation of Title 18, United States Code, Section 371.

COUNTS TWO AND THREE: (18 U.S.C. §§ 1832(a)(1),(2),(3), & 2 – Theft of Trade Secrets; Aiding and Abetting)

58.     The factual allegations contained in paragraphs 1 through 57 are realleged and

incorporated as if fully set forth herein.

59.     On or about August 17, 2016, in the Northern District of California and elsewhere, the

defendant,

RACO IVANOV JORDANOV,

intending to convert a trade secret, that was related to a product and service used in and intended for use

in interstate and foreign commerce to the economic benefit of anyone other than the owner of that trade

secret, and knowing and intending that the offenses would injure the owner of that trade secret, as

specified below:

        a.      knowingly stole, and without authorization appropriated, took, carried away, concealed, and by fraud, artifice, and deception obtained trade secrets belonging to Genentech;

        b.      knowingly and without authorization copied, duplicated, sketched, drew, downloaded, uploaded, altered, photocopied, replicated, transmitted, delivered, sent, communicated, and conveyed trade secrets belonging to Genentech; and

        c.      knowingly and without authorization received, bought, and possessed trade secrets belonging to Genentech, knowing the same to have been stolen and appropriated, obtained, and converted without authorization:

| Count | Trade Secret Description |
| --- | --- |
| 2 | Document compiling information, identified in numerous places as being the property of Genentech, Inc., and marked as proprietary and confidential relating to the technology transfer of Genentech biologics Avastin and Herceptin to a new manufacturing site. |
| 3 | Document compiling information, identified in numerous places as being the property of Genentech, Inc., and marked as proprietary and confidential, relating to Genentech's practices for conducting technology transfers. |

Each in violation of Title 18 United States Code, Sections 1832(a)(1), (2), (3), and 2.

COUNTS FOUR THROUGH SIX:   (18 U.S.C. §§ 1343 and 2–Wire Fraud)

      60.     The factual allegations in Paragraphs 1 through 59 are re-alleged and incorporated by reference.

      61.     On or about the dates set forth below, in the Northern District of California and elsewhere, the defendants,

RACO IVANOV JORDANOV, and<br>ROSE LIN,

did knowingly, and with intent to defraud, devise and intend to devise a scheme and artifice to defraud as to a material matter and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, and, for the purpose of executing such scheme and artifice and attempting to do so, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, namely:

| Count | Date | Description |
|-------|------|-------------|
| 4 | December 5, 2016 | Foreign and interstate email from Shanghai, China, to the United States and the Northern District of California circulating final versions of the signed BPOA and other key documents with Sanofi |
| 5 | December 9, 2016 | Foreign and interstate email from Shanghai, China, to the United States and the Northern District of California circulating final versions of the signed BPOA and other key documents with Sanofi with a "chopped signature page" etc. |
| 6 | December 16, 2016 | Foreign and interstate bank wire from Singapore to the United States and the Southern District of New York for approximately $80 million USD from Citibank Singapore for Sanofi-Aventis Singapore PTE. LTD. to Ta Chong Bank LTD in Taiwan for the benefit of JHL Biotech, Inc., in the Cayman Islands, using Citibank N.A. in New York, New York as the correspondent bank |

Each in violation of Title 18, United States Code, Sections 1343 and 2.

COUNTS SEVEN THROUGH TWENTY: (18 U.S.C. §§ 1956(a)(2)(A) and 2 – International Laundering of Monetary Instruments)

62.     Paragraphs 1 through 61 above are incorporated and realleged as if fully set forth here.

63.     As part of their employment agreements with JHL Biotech, JORDANOV and LIN were entitled to receive "Renewal Incentives", a form of bonus payment intended to induce their continued work at JHL Biotech.  JORDANOV and LIN enjoyed large discretion to make recommendations regarding their bonus compensation within JHL Biotech, including the amount, allocation, and timing of such payments and the accounts to which they would be paid.  In addition, concurrently with Sanofi's payment of $101 million dollars, JHL Biotech's Board of Directors and Compensation Committee granted JORDANOV, as CEO of JHL Biotech, discretion to allocate 1% of the total transaction amount as a bonus payment.  Thereafter, LIN and JORDANOV received bonus payments.

64.     On or about the dates alleged below, in the Northern District of California and elsewhere, the defendants listed in the table below, did knowingly transmit and transfer monetary instruments listed in the table below, from or to a place outside the United States, to or from a place inside the United States, with intent to promote the carrying on of the specified unlawful activity of wire fraud in violation of 18 U.S.C. § 1343, and in doing so did conduct the financial transactions listed in the chart below:

//

//

| Count | Defendant | Date | Amount | Description |
|---|---|---|---|---|
| 7 | RACO IVANOV JORDANOV | 12/01/2016 | $133,606.30 | Wire Transfer from Ta Chong Bank (Taiwan) Account # xxxxxxxx1824 to Union Bank Account # xxxx2236 controlled by JORDANOV |
| 8 | RACO IVANOV JORDANOV | 12/01/2016 | $133,606.30 | Wire Transfer from Ta Chong Bank (Taiwan) Account # 300260661824 to Union Bank Account # xxxxxx9605 controlled by JORDANOV |
| 9 | RACO IVANOV JORDANOV | 01/03/2017 | $133,606.30 | Wire Transfer from Ta Chong Bank (Taiwan) Account # xxxxxxxx1824 to Union Bank Account # xxxx2236 controlled by JORDANOV |
| 10 | RACO IVANOV JORDANOV | 01/03/2017 | $133,606.30 | Wire Transfer from Ta Chong Bank (Taiwan) Account # xxxxxxxx1824 to Union Bank Account # xxxxxx9605 controlled by JORDANOV |
| 11 | RACO IVANOV JORDANOV | 01/20/2017 | $94,000.00 | Wire Transfer from Ta Chong Bank (Taiwan) Account # xxxxxxxx1824 to Union Bank Account # xxxx2236 controlled by JORDANOV |
| 12 | RACO IVANOV JORDANOV | 01/20/2017 | $94,000.00 | Wire Transfer from Ta Chong Bank (Taiwan) Account # xxxxxxxx1824 to Union Bank Account # xxxxxx9605 controlled by JORDANOV |
| 13 | RACO IVANOV JORDANOV | 04/19/2017 | $476,733.00 | Wire Transfer from Ta Chong Bank (Taiwan) Account # xxxxxxxx1824 to Union Bank Account # xxxx2236 controlled by JORDANOV |
| 14 | RACO IVANOV JORDANOV | 01/05/2018 | $213,833.34 | Wire Transfer from Yuanta Commercial Bank (Taiwan) Account # xxxxxxxx1824 to Union Bank Account # xxxx2236 controlled by JORDANOV |
| 15 | RACO IVANOV JORDANOV | 01/05/2018 | $213,833.33 | Wire Transfer from Yuanta Commercial Bank (Taiwan) Account # xxxxxxxx1824 to Union Bank Account # xxxxxx9605 controlled by JORDANOV |
| 16 | ROSE LIN | 12/01/2016 | $133,606.30 | Wire Transfer from Ta Chong Bank (Taiwan) Account # xxxxxxxx1824 to Bank of America Account # xxxxxxxx7208 controlled by LIN |

| Count | Defendant | Date | Amount | Description |
|-------|-----------|------|--------|-------------|
| 17 | ROSE LIN | 01/03/2017 | $133,606.30 | Wire Transfer from Ta Chong Bank (Taiwan) Account # xxxxxxxx1824 to Bank of America Account # xxxxxxxx7208 controlled by LIN |
| 18 | ROSE LIN | 01/20/2017 | $94,000.00 | Wire Transfer from Ta Chong Bank (Taiwan) Account # xxxxxxxx1824 to Bank of America Account # xxxxxxxx7208 controlled by LIN |
| 19 | ROSE LIN | 04/19/2017 | $626,733.00 | Wire Transfer from Ta Chong Bank (Taiwan) Account # xxxxxxxx1824 to Bank of America Account # xxxxxxxx7208 controlled by LIN |
| 20 | ROSE LIN | 01/05/2018 | $427,666.67 | Wire Transfer from Yuanta Commercial Bank (Taiwan) Account # xxxxxxxx1824 to Bank of America Account # xxxxxxxx7208 controlled by LIN |

Each in violation of Title 18, United States Code, Section 1956(a)(2)(A).

COUNT TWENTY-ONE: (18 U.S.C. § 371 – Conspiracy; 18 U.S.C. § 1512(c)–Tampering with a Witness, Victim, or an Informant)

65.    Paragraphs 1 through 64 are realleged as if set forth fully here.

66.    Beginning in or about September 2018, and continuing through on or about 2019, in the Northern District of California and elsewhere, the defendants,

RACO IVANOV JORDANOV and
ROSE LIN,

and others, did conspire, unlawfully, willfully, and knowingly, to commit an offense against the United States, to wit, tampering with a witness, victim, or an informant, in violation of 18 U.S.C. § 1512(c), and one or more persons committed an act to effect the object of the conspiracy, namely, to corruptly alter, destroy, mutilate, and conceal a record, document, and other object, and attempt to do so, with the intent to impair the object's integrity and availability for use in an official proceeding; and otherwise corruptly obstruct, influence, and impede an official proceeding, to wit, the investigation of the Grand Jury.

//

//

INDICTMENT            28

Manner and Means of the Conspiracy

67.    On or about March 16, 2017, the Grand Jury began an investigation relating to the facts and circumstances of JHL Biotech.

68.    In or about September 2017, agents of the Federal Bureau of Investigation (FBI) executed a search warrant at the home of Xanthe Lam and Allen Lam in South San Francisco, California.

69.    In or about October 2017, LIN telephoned with Xanthe Lam about the search warrant and the FBI investigation.

70.    Beginning in or about September 2017, after learning about the FBI investigation, JORDANOV and LIN undertook a variety of steps to conceal their criminal wrongdoing and obstruct the criminal investigation.

71.    In late 2018, after the lawsuit began and the allegations of misappropriation of intellectual property were known to the public, JORDANOV worked with a consultant to evaluate whether certain confidential and proprietary information was available on the internet or from other public sources when, in fact, JORDANOV knew the confidential and proprietary information used by JHL Biotech had been obtained from Genentech documents and not from public sources.

Overt Acts

72.    In furtherance of the conspiracy, and to affect the objects thereof, the following overt act, among others, were committed in the Northern District of California and elsewhere:

    a.    In or about September 2018, after being stopped for questioning upon entering the United States at San Francisco International Airport (SFO), LIN made false and misleading statements to the FBI about Xanthe Lam and the work Xanthe Lam did at JHL Biotech.

    b.    In or about September 2018, JORDANOV ordered an employee at JHL Biotech to delete the trade secret tech transfer document JORDANOV had previously given to the employee.

    c.    In or about November 22, 2018, JORDANOV emailed an individual, S.H., asking for "help with identifying public information on Technology Transfer of biotech products."

    d.    On or about November 25, 2018, JORDANOV emailed S.H. again asking for "anything that [Company] has published or presented publicly" relating to technology transfers.

1    All in violation of Title 18, United States Code, Section 371.

2    COUNT TWENTY-TWO: (18 U.S.C. § 1001(a)(2)–False Statements to a Government Agency)

3    73.    Paragraphs 1 through 72 are realleged as if set forth fully here.

4    74.    On or about September 22, 2018 and September 27, 2018, in the Northern District of

5    California and elsewhere, the defendant,

6                                    ROSE LIN,

7    did willfully and knowingly make materially false, fictitious, and fraudulent statements and

8    representations in a matter within the jurisdiction of the executive branch of the Government of the

9    United States, namely, agents of the Federal Bureau of Investigation investigating the possible theft of

10   trade secrets from Genentech, among other offenses.

11   75.    During her statement to the FBI, which started on September 22, 2018 and continued

12   again on September 27, 2018, LIN lied about the role of Xanthe Lam at JHL Biotech.  Specifically, LIN

13   falsely told FBI agents that JHL Biotech never paid Xanthe Lam and that LIN did not know that Xanthe

14   Lam was providing information from Genentech to Allen Lam.  In fact, LIN arranged for JHL Biotech

15   to pay Xanthe Lam for her work at JHL Biotech.

16   76.    As LIN knew, Xanthe Lam's work at JHL Biotech and the need to conceal it was an

17   "open secret" at JHL Biotech.  LIN and others at JHL Biotech regularly used Xanthe Lam to provide

18   information from Genentech to help JHL Biotech.

19   All in violation of Title 18, United States Code, Section 1001(a)(2).

20   FORFEITURE ALLEGATIONS:

21   77.    The factual allegations contained in Paragraphs 1 through 76 are hereby realleged for the

22   purpose of alleging forfeiture to the United States of America pursuant to Title 18, United States Code,

23   Sections 981(a)(1)(C) and Title 28, United States Code, Section 2461(c); and Title 18, United States

24   Code, Section 982(a)(1).

25   78.    Upon conviction of the offenses in Counts One through Three of this Indictment, the

26   defendants,

27                              RACO IVANOV JORDANOV and
                                       ROSE LIN,

28

1  shall forfeit to the United States of America, pursuant to Title 18, United States Code, Sections 1834 and

2  2323, any property used, or intended to be used, in any manner or part to commit or facilitate the

3  commission of the offenses, and any property constituting or derived from any proceeds obtained

4  directly or indirectly as a result of the commission of the offenses.

5      79.    Upon conviction of the offenses in Counts One, Four, Five, and Six of this Indictment,

6  the defendants,

7                          RACO IVANOV JORDANOV and
                            ROSE LIN,
8

9  shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section

10  981(a)(1)(C), as incorporated by Title 28, United States Code, Section 2461(c), any property, real or

11  personal, which constitutes or is derived from proceeds traceable to a violations of Title 18, United

12  States Code, Section 1343.  The United States will also seek a forfeiture money judgment against each

13  defendant equal to the value of any property, real or personal, which constitutes or is derived from

14  proceeds traceable to these offenses.

15      80.    Upon conviction of the offenses in Counts Seven through Twenty of this Indictment, the

16  defendants,

17                          RACO IVANOV JORDANOV and
                            ROSE LIN,
18

19  shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(1),

20  any property, real or personal, involved in a violation of Title 18, United States Code, Section 1956 or

21  any property traceable to such property.  The United States will also seek a forfeiture money judgment

22  against each defendant equal to the value of any property, real or personal, involved in these offenses, or

23  property traceable to such property.

24      81.    If any of the property described above, because of any act or omission of the defendant:

25          a.    cannot be located upon exercise of due diligence;

26          b.    has been transferred or sold to, or deposited with, a third party;

27          c.    has been placed beyond the jurisdiction of the court;

28          d.    has been substantially diminished in value; or

1          e.      has been commingled with other property which cannot be divided without

2      difficulty,

3  the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21,

4  United States Code, Section 853(p), as incorporated by Title 28, United States Code, Sections 2323(b)

5  and 2461(c).

6          All pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(1), 1834, and 2323;

7  Title 28, United States Code, Section 2461(c); Title 21, United States Code, Section 853; and Federal

8  Rule of Criminal Procedure 32.2.

9

10

11

DATED: June 1, 2021                                    A TRUE BILL.

12

13

                                                       _____/s/_____
14                                                     FOREPERSON

15

STEPHANIE M. HINDS
16  Acting United States Attorney

17

      _____/s/_____
18  SHEILA A.G. ARMBRUST
19  Assistant United States Attorney

20

      _____/s/_____
21  ADAM A. REEVES
22  Assistant United States Attorney

23

24

25

26

27

28

INDICTMENT                              32

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT ☐ INFORMATION ☒ INDICTMENT

☐ SUPERSEDING

### OFFENSE CHARGED

Counts 1, 21: 18 U.S.C. § 371 – Conspiracy
Counts 2-3 (18 U.S.C. §§ 1832(a)(1)(2)(3) and 2 – Theft of Trade Secrets, Aid / Abet
Counts 4-6: 18 U.S.C. §§ 1343 and 2 - Wire Fraud, Aid / Abet
Counts 7-15: 18 U.S.C. § 1956(a)(2)(A) - International Money Laundering

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY: See Attachment

---

Name of District Court, and/or Judge/Magistrate Location

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

### DEFENDANT - U.S

▶ Raco Ivanov Jordanov a/k/a Racho Jordanov

DISTRICT COURT NUMBER

CR 21-0227 VC

**FILED**

Jun 01 2021

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

### PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)

IRS-CI / FBI

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:

  ☐ U.S. ATTORNEY   ☐ DEFENSE

} SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

} MAGISTRATE CASE NO.

Name and Office of Person Furnishing Information on this form

☐ U.S. Attorney ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)    Sheila Armbrust / Adam Reeves

---

### DEFENDANT

IS *NOT* IN CUSTODY
Has not been arrested, pending outcome this proceeding.
1) ☐ If not detained give date any prior summons was served on above charges ▶ _____

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

_____

IS IN CUSTODY

4) ☐ On this charge

5) ☐ On another conviction

6) ☐ Awaiting trial on other charges

} ☐ Federal ☐ State

If answer to (6) is "Yes", show name of institution

_____

Has detainer ☐ Yes   } If "Yes" give date filed
been filed? ☐ No

DATE OF ARREST    Month/Day/Year

Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED TO U.S. CUSTODY    Month/Day/Year

☐ This report amends AO 257 previously submitted

---

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:

☐ SUMMONS ☐ NO PROCESS* ☒ WARRANT    Bail Amount: none

If Summons, complete following:
☐ Arraignment ☐ Initial Appearance

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment*

Defendant Address:

Date/Time: _____ Before Judge: _____

Comments:

**ATTACHMENT**
(Raco Ivanov Jordanov)

**Statutory Maximum Penalties:**

<u>Count 1</u> (18 U.S.C. § 371 – Conspiracy to Commit Theft of Trade Secrets and Wire Fraud):
Five years of imprisonment; $250,000 fine; three years of supervised release; $100 mandatory
special assessment per count, forfeiture, restitution.

<u>Counts 2 and 3</u> (18 U.S.C. §§ 1832(a)(1)(2)(3) and 2 – Theft of Trade Secrets, Aid and Abet):
Ten years of imprisonment, $250,000 fine, three years of supervised release, $100 special
assessment per count, forfeiture, restitution

<u>Count 4 through 6</u> (18 U.S.C. §§ 1343 and 2 – Wire Fraud, Aid and Abet):   Twenty years of
imprisonment; $250,000 fine; three years of supervised release; $100 mandatory special
assessment per count, forfeiture, restitution.

<u>Counts 7 through 15</u> (18 U.S.C. § 1956(a)(2)(A) – International Money Laundering):   Twenty
years of imprisonment; $500,000 fine; three years of supervised release; $100 mandatory special
assessment per count, forfeiture.

<u>Count 21</u> (18 U.S.C. § 371 – Conspiracy to Obstruct Justice):   Five years of imprisonment;
$250,000 fine; three years of supervised release; $100 mandatory special assessment.

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT  ☐ INFORMATION  ☒ INDICTMENT

☐ SUPERSEDING

**Name of District Court, and/or Judge/Magistrate Location**

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

### OFFENSE CHARGED

Counts 1, 21: 18 U.S.C. § 371 – Conspiracy
Counts 4-6: 18 U.S.C. §§ 1343 and 2 – Wire Fraud, Aid / Abet
Counts 17-20: 18 U.S.C. § 1956(a)(2)(A) - International Money Laundering
Count 22: 18 U.S.C. § 1001(a)(2) - False Statements to a Government Agency

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY:   See Attachment

**DEFENDANT - U.S**

► Rose Lin a/k/a Rose Sweihorn Tong

DISTRICT COURT NUMBER

CR 21-0227 VC

**FILED**

Jun 01 2021

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

### PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)

IRS-CI / FBI

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40.  Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:       } SHOW DOCKET NO.
  ☐ U.S. ATTORNEY    ☐ DEFENSE

☐ this prosecution relates to a pending case involving this same defendant       } MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under }

Name and Office of Person
Furnishing Information on this form

☐ U.S. Attorney    ☐ Other U.S. Agency

Name of Assistant U.S.
Attorney (if assigned)    Sheila Armbrust / Adam Reeves

### DEFENDANT

**IS *NOT* IN CUSTODY**

1) ☐ Has not been arrested, pending outcome this proceeding. If not detained give date any prior summons was served on above charges ►

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**

4) ☐ On this charge

5) ☐ On another conviction    }

6) ☐ Awaiting trial on other charges    } ☐ Federal ☐ State

If answer to (6) is "Yes", show name of institution

Has detainer been filed?  ☐ Yes  ☐ No    } If "Yes" give date filed

**DATE OF ARREST** ►    Month/Day/Year

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY** ►    Month/Day/Year

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:

☐ SUMMONS  ☐ NO PROCESS*  ☒ WARRANT    Bail Amount: none

If Summons, complete following:
☐ Arraignment  ☐ Initial Appearance

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment*

Defendant Address:

Date/Time:                    Before Judge:

Comments:

# ATTACHMENT
(Rose Lin)

## Statutory Maximum Penalties:

Count 1 (18 U.S.C. § 371 – Conspiracy to Commit Theft of Trade Secrets and Wire Fraud): Five years of imprisonment; $250,000 fine; three years of supervised release; $100 mandatory special assessment per count, forfeiture, restitution.

Count 4 through 6 (18 U.S.C. §§ 1343 and 2 – Wire Fraud, Aid and Abet):  Twenty years of imprisonment; $250,000 fine; three years of supervised release; $100 mandatory special assessment per count, forfeiture, restitution.

Counts 17 through 20 (18 U.S.C. § 1956(a)(2)(A) – International Money Laundering):  Twenty years of imprisonment; $500,000 fine; three years of supervised release; $100 mandatory special assessment per count, forfeiture.

Count 21 (18 U.S.C. § 371 – Conspiracy to Obstruct Justice):  Five years of imprisonment; $250,000 fine; three years of supervised release; $100 mandatory special assessment.

Count 22 (18 U.S.C. § 1001(a)(2) – False Statements to a Government Agency):  Five years of imprisonment; $250,000 fine; three years of supervised release; $100 mandatory special assessment.